Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
E-mail: michael@lozeaudrury.com
          doug@lozeaudrury.com
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205

Emily Jeffers (State Bar No. 274222)
E-mail: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Tel: (510) 844-7100
Fax: (510) 844-7150

Attorneys for Plaintiff
CENTER FOR BIOLOGICAL DIVERSITY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> REHRIG PACIFIC COMPANY, a corporation, <br><br> Defendant. | Case No.  _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation, by and

through its counsel, hereby alleges:

## I.   <u>JURISDICTION AND VENUE</u>

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On June 7, 2018, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

COMPLAINT

This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **<u>INTRODUCTION</u>**

5.      This complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's industrial facility located at 4010 26th Street in Los Angeles, California ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.       With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.      Plastic pollution is ubiquitous in the marine environment; more than 5 trillion plastic pieces, weighing over 250,000 tons, currently float in the world's

oceans.  Plastic debris affects marine mammals, fish, turtles, and seabirds via entanglement and strangulation, but also via ingestion and the transfer of toxic chemicals.  Adsorption of persistent organic pollutants onto plastic and transfer into the tissues and organs through ingestion is impacting species worldwide.  More than 500 marine species are known to be affected by entanglement or ingestion of plastic debris.  Storm water represents a significant source of plastic pollution.

8.     In order to effectively regulate the number and diversity of industrial facilities discharging storm water runoff coming into contact with their operations, the Act and the General Permit depend on timely and accurate monitoring and reporting of facilities' efforts to implement the best available water pollution control measures. Only by preparing complete storm water pollution prevention plans, analyzing samples for all potentially problematic pollutants, and preparing complete annual reports can a facility systematically bring its pollution sources under control. The plans and reports also are essential for the agencies and the general public to effectively monitor, inspect, and, where necessary, enforce violations of the General Permit.  Compliance with the General Permit's entire scheme is essential to minimizing polluted storm water and non-storm water from industrial facilities that contribute to the impairment of receiving waters and downstream waters and aquatic-dependent wildlife.

## III.   <u>PARTIES</u>

<u>Center for Biological Diversity</u>

9.     Plaintiff Center for Biological Diversity (the "Center") is a nonprofit corporation dedicated to the preservation of biodiversity, native species, and

COMPLAINT

ecosystems. The Center is organized under the laws of the State of California with a field office in Los Angeles, California. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats, including aquatic species and habitats, throughout the United States and abroad. The Center has more than 50,000 active members, including over 3,000 in the greater Los Angeles area. The Center works to ensure the long-term health and viability of animal and plant communities across the United States and elsewhere, and to protect the habitat these species need to survive. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. To further this mission, the Center actively seeks to ensure that aquatic ecosystems remain free from damaging pollution by investigating potential pollution sources, reviewing monitoring data, pollution control plans, and reports prepared by facilities suspected of discharging pollutants to rivers, lakes, waterways and coastal waters in California and other states. Almost all of the publicly-available information necessary to this work is generated by programs implemented through the Clean Water Act and related state water quality laws. This work includes ensuring that industrial facilities are complying with the Permit and, where violations of the Permit are discovered, initiating enforcement actions on behalf of itself and its members when necessary.

10.     The Center has members living in the community adjacent to the Facility and the Los Angeles River Watershed. They enjoy using the Los Angeles River for recreation and other activities. Members of the Center use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be

COMPLAINT

5

discharged.  Members of the Center use those waters to recreate, hiking along their shorelines and riverbeds, viewing wildlife, and engaging in scientific studies and conservational activities, among other activities.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of the Center's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11.    The Center is also suffering procedural and informational injuries resulting from Defendant's failure to comply with the General Permit's Storm Water Pollution Prevention Plan requirements, Requirements for Plastic Materials, and Monitoring and Reporting requirements.  Due to Defendant's violations of law, the Center and its members are deprived of informational and procedural benefits that would aid them in their activities to protect water quality, conserve habitat, effectively advocate with specific facilities to reduce their pollution, and enforce the Clean Water Act.

12.    The Center brings this action on behalf of its members.  The Center's interest in reducing Defendant's discharges of pollutants into the Los Angeles River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of the Center.

13.    Continuing commission of the acts and omissions alleged above will

COMPLAINT

irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

<u>Owners and/or Operators of the Facility</u>

14.     The Center is informed and believes, and thereon alleges, Defendant REHRIG PACIFIC COMPANY ("Rehrig") is a corporation that owns and/or or operates a plastics manufacturing facility located in Los Angeles, California.

15.     The Center is informed and believes, and thereon alleges, the registered agent for service of process for Rehrig is Cogency Global, Inc., 1325 J. Street, Suite 1550, Sacramento, CA 95814.

## IV.   **STATUTORY BACKGROUND**

### **Clean Water Act**

16.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

17.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

18.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator

COMPLAINT

of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

19.    The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

20.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

21.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause

pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan issued by the State Board or the applicable Water Quality Control Plan (known as the Basin Plan) issued by the Regional Board, a regional subdivision of the State Board with authority spelled out under California law.  Cal. Water Code §13200.

22.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.  After filing the NOI, the discharger is then "enrolled" in the General Permit and subject to its conditions and requirements.

23.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.

COMPLAINT

The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* 1997 Permit, § A(2); 2015 Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. 1997 Permit, §§ A(9), (10); 2015 Permit, § X(B). Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. 2015 Permit, Fact Sheet § I(1).

24.    Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the

COMPLAINT

2015 Permit's technology-based effluent limitations and receiving water limitations. *See* 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  *See* 2015 Permit, §§ X(G)(2), (4), (5).  Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

25.    Section X(D)(1) of the 2015 Permit requires a discharger to identify alternate team members to implement the SWPPP.  Section X(D)(2)(d) of the 2015 Permit requires a discharger to document the Facility's scheduling operating hours in the SWPPP.  Section X(E) of the 2015 Permit requires a SWPPP map to include a north arrow and a legend; depict a facility's boundary; depict the location of storm water collection and conveyance systems; indicate where materials are directly exposed to precipitation; and identify all areas of industrial activity.  Section X(F) of the 2015 Permit requires a SWPPP to include a list of industrial materials handled at a facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency.  Section X(G)(1)(a) of the 2015 Permit requires a SWPPP to describe each industrial process at a facility.  Section X(G)(1)(b) of the 2015 Permit requires a SWPPP to describe each material handling and storage area at a facility.  Section X(G)(1)(c) of the 2015 Permit requires a SWPPP to describe all industrial activities that generate a significant amount of dust or particulate that may be deposited within a facility's boundaries.  Section X(G)(1)(e)

of the 2015 Permit requires a SWPPP to contain an assessment of the non-storm water discharges ("NSWDs") at a facility and a description of how all NSWDs have been eliminated.  Section X(G)(2) of the 2015 Permit requires a SWPPP to include narrative assessment of all areas of industrial activity with potential industrial pollutant sources, and to identify where the minimum BMPs in different areas of a facility will not adequately reduce the pollutants in the facility's storm water dischargers and to identify advanced BMPs for those areas.  Section X(H) of the 2015 Permit requires a SWPPP to implement and maintain the required minimum BMPs for material handling and waste management and to identify and justify each minimum BMP or applicable BMP not being implemented at a facility because they do not reflect best industry practice considering BAT/BCT.  Section X(I) of the 2015 Permit requires a SWPPP to include a Monitoring Implementation Plan that complies with the 2015 Permit.

26.    The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  *See* 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial

storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* 2015 Permit, § X(H)(2). Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit. *Id*. The 2015 Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table. *See* 2015 Permit, § X(H)(4), (5).

27.    The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP") (previously known as the Monitoring and Reporting Program). The primary objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. The 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility. *See* 1997 Permit, § B(5). The 2015 Permit mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year. *See* 2015 Permit, §§ XI(B)(2), (3).

28.    Under the 2015 Permit, facilities must analyze storm water samples for

"[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c). Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." 1997 Permit, § B(5)(c)(ii).

29.    Section XVIII of the 2015 Permit sets forth "Special Requirements" for facilities that handle Plastic Materials. The 2015 Permit defines Plastic Materials as including the following types of sources of Plastic Materials: "virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other types of preproduction plastics with the potential to discharge or migrate off-site." 2015 Permit, Findings, P(73). The 2015 Permit requires Facilities that handle Plastic Materials to implement specific BMPs to eliminate discharges of plastic in storm water.

30.    Section XVIII(A)(1) of the 2015 Permit requires facilities handling Plastic Materials to implement and include a variety of measures in a facility's SWPPP, including on-site containment systems (or a technically feasibly alterative BMP or suite of BMPs), durable sealed containers, capture devices, and a vacuum system. A facility is exempt from the requirement to install a containment system if a suite of eight required BMPs is implemented. 2015 Permit, § XVIII(A)(2)(b).

31.    Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. 1997 Permit, § B(7); 2015

COMPLAINT

14

Permit, § XI.A.

32.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

33.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  2015 Permit, Fact Sheet, Paragraph O.

34.     The 2015 Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  *See* 2015 Permit, § XV.  The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report").  1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.

35.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

COMPLAINT

**Basin Plan**

36.     The Regional Board has identified beneficial uses and established water

quality standards for the Los Angeles River, the Los Angeles River Estuary, and the

San Pedro Bay in the "Water Quality Control Plan, Los Angeles Region Basin Plan

for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred

to as the Basin Plan.

37.     The beneficial uses of these waters include, among others, municipal and

domestic supply, groundwater recharge, water contact recreation, non-contact water

recreation, warm freshwater habitat, wildlife habitat, wetland habitat, marine habitat,

rare, threatened, or endangered species, preservation of biological habitats, migration

of aquatic organisms, spawning, reproduction, and/or early development, and shellfish

harvesting.  The non-contact water recreation use is defined as "[u]ses of water for

recreational activities involving proximity to water, but not normally involving

contact with water where water ingestion is reasonably possible.  These uses include,

but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping,

boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in

conjunction with the above activities."

38.     Discharges of pollutants at levels above water quality standards

contribute to the impairment of beneficial uses of the waters receiving the discharge,

in violation of the General Permit.

39.     The Basin Plan includes a narrative toxicity standard which states that

"[a]ll waters shall be maintained free of toxic substances in concentrations that are

toxic to, or that produce detrimental physiological responses in, human, plant, animal,

or aquatic life."

40.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

41.    The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

42.    The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5."

43.    The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

44.    The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

45.    The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

46.     The EPA has adopted a freshwater numeric water quality standard for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC").  65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule).

47.    The EPA 303(d) List of Water Quality Limited Segments lists Reach 2 of

COMPLAINT

17

the Los Angeles River as impaired for trash, oil, nutrients, copper, and lead, among other pollutants.  See http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml.  Reach 1 of the Los Angeles River is impaired for zinc, lead, copper, trash, pH, nutrients, and pathogens, among other pollutants.  The Los Angeles River Estuary is impaired for trash and sediment toxicity, among other pollutants.  San Pedro Bay is impaired for sediment toxicity, among other pollutants.

48.     EPA has established Parameter Benchmark Values as objective guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (July 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; and zinc – 0.26 mg/L.

49.     The Numeric Action Levels ("NALs") in the 2015 Permit are derived from these benchmarks.  The 2015 Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have

COMPLAINT

18

been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; and zinc – 0.26 mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

50.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $52,414 for violations occurring after November 2, 2015; and up to

$37,500 per day per violation occurring since October 28, 2011, up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.    STATEMENT OF FACTS

51.    The Center is informed and believes, and thereon alleges, the Facility covers an area of approximately 204,791 square feet and is almost fully paved.

52.    The Facility falls within Standard Industrial Classification ("SIC") Codes 3089 and 2821.

53.    The Center is informed and believes, and thereon alleges, that industrial activities at the Facility include the manufacturing of pallets and crates, trays, roll-out carts and bins; shipping/receiving materials and finished goods; materials storage; loading and unloading of trucks and rail cars; and activities associated with oily water collection.

54.     Based on the Center's investigation, including a review of the Facility's NOI, SWPPP, aerial photography, and the Center's information and belief, storm water is collected via a system of surface drainage and discharged from the Facility via at least four outfalls. Storm water discharged from the Facility flows into channels that empty into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay (collectively, "Facility Receiving Waters").

55.    Information available to Plaintiff indicates that the Facility Receiving Waters are waters of the United States.

56.    Plaintiff is informed and believes, and thereupon alleges that the storm

COMPLAINT

water flows over the surface of the Facility where industrial activities occur, as well as areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects plastic pellets, oil & grease, pH-altering substances, zinc, and other potential pollutants as it flows towards the storm water discharge locations.

57.     On information and belief, Plaintiff alleges that the storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

58.     On information and belief, the Center alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

59.     Since at least November 21, 2013, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in reports submitted to the State Board via the Stormwater Multiple Application and Report Tracking System ("SMARTS").

COMPLAINT

Defendant certified each of those reports pursuant to the General Permit.

60.    In storm water sampling results submitted to the State Board for the past three years, the Facility has reported high pollutant levels from its storm water sampling results.

61.    The Facility has reported numerous discharges in excess of numeric and narrative water quality standards established in the Basin Plan.  These observations have thus violated numeric and narrative water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

62.    On the following dates, the Center alleges that the Facility's observations of its storm water discharges demonstrated violations of narrative water quality standards in the Basin Plan for coloration and oil and grease: December 2, 2014; October 31, 2014; February 26, 2014; and November 21, 2013.

63.    On the following dates, the Center alleges that the Facility's observations of its storm water discharges demonstrated violations of narrative water quality standards in the Basin Plan for suspended or settleable material: May 14, 2015; and April 22, 2015.

64.    The Facility has reported several discharges outside of the range of the numeric water quality standard for pH of 6.5 – 8.5 established in the Basin Plan. Defendant measured storm water discharges with a pH level below 6.5 on the

following dates: March 22, 2018; March 2, 2018; February 17, 2017; April 19, 2016; and March 11, 2016.

65.    The levels of pH in storm water detected at the Facility have been below the benchmark value and annual NAL for pH of 6.0 – 9.0 s.u. established by EPA and the State Board, respectively.  Defendant analyzed storm water discharged from the Facility with a pH less than 6.0 s.u. on March 22, 2018; and April 19, 2016.

66.    The levels of O&G in storm water detected by the Facility have exceeded the benchmark value and annual NAL for O&G of 15 mg/L established by EPA and the State Board, respectively.  For example, on March 2, 2018, the level of O&G measured by Defendant at one of the Facility's storm water outfalls was 58 mg/L. That level of O&G is almost 4 times the benchmark value and annual NAL for O&G. Defendant also measured levels of O&G in storm water discharged from the Facility in excess of 15 mg/L on February 17, 2017; February 27, 2014; and December 6, 2013.  In addition, the Facility measured storm water discharges with levels of O&G in excess of the instantaneous NAL for O&G of 25 mg/L during the 2015-2016, 2016-2017, and 2017-2018 reporting years.

67.    The levels of zinc in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.12 mg/L for zinc (CMC) for zinc.  For example, on March 22, 2018, the level of zinc measured at one of the Facility's storm water outfalls was 0.71 mg/L.  That level of zinc is almost 6 times the CMC for zinc.  Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.12 mg/L on March 2, 2018; February 17, 2017; and December 30, 2016.

COMPLAINT

68.    The levels of zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively.  For example, on March 22, 2018, the level of zinc measured at one of the Facility's storm water outfalls was 0.71 mg/L.  That level of zinc is almost 3 times the benchmark value and annual NAL for zinc.  Defendant also measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L on February 17, 2017.

69.    The Center alleges that local precipitation data compared to dates when Rehrig collected and analyzed storm water samples at the Facility or when it conducted visual observations of storm water discharges shows that discharges occurred on several dates during each of those wet seasons and reporting years. Specifically, on information and belief, the Center alleges that discharges occurred during qualifying storm events on the following dates when the Facility was operating: November 21, 2013; November 29, 2013; December 19, 2013; February 26, 2014; February 27, 2014; April 1, 2014; October 31, 2014; December 2, 2014; December 12, 2014; December 16, 2014; December 30, 2014; April 7, 2015; May 8, 2015; May 14, 2015; September 15, 2015; October 5, 2015; January 5, 2016; February 17, 2016; April 8, 2016; October 17, 2016; December 15, 2016; December 21, 2016; January 5, 2017; January 9, 2017; January 19, 2017; February 3, 2017; February 6, 2017; February 10, 2017; October 20, 2017; January 8, 2018; and March 21, 2018.

70.    The Center alleges that on the following days, Rehrig made visual observations of storm water discharges from the Facility yet it failed to collect and

COMPLAINT

24

analyze storm water discharges on said days: November 21, 2013; February 26, 2014; October 31, 2014; and May 14, 2015.

71.    On information and belief, the Center alleges that during the 2013-2014 and 2014-2015 wet seasons, Rehrig failed to collect and analyze a storm water sample from any storm events at the Facility in accordance with the General Permit.

72.    During the first half of the 2015-2016 reporting year, the Center alleges that Rehrig failed to collect and analyze the required storm water discharges at the Facility in accordance with the General Permit.

73.    During the first and second halves of the 2016-2017 reporting year, the Center alleges that Rehrig failed to collect and analyze the second required storm water discharges at the Facility in accordance with the General Permit.

74.    On information and belief, the Center alleges that the storm water sample collected from the Facility on March 22, 2018, was not taken during a QSE.  Such an event must be preceded by 48 hours with no discharge from any drainage area.  2015 Permit, § XI(B)(1)(b).  On information and belief, the Center alleges that the Facility was discharging storm water during the rain event on March 21, 2018, so March 22, 2018 was not a QSE.

75.    On information and belief, the Center alleges that the storm water sample taken at the Facility on April 19, 2016, was not from a QSE, as the Center alleges that no measured rainfall was observed in the Los Angeles area on that date.

76.    On information and belief, the Center alleges that during the 2015-2016 reporting year, Rehrig failed to analyze storm water discharges from the Facility for zinc.

COMPLAINT

77.    On information and belief, the Center alleges that Rehrig has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the Facility.

78.    On information and belief, Plaintiff alleges that since at least August 11, 2013, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, zinc, O&G, and other potentially un-monitored pollutants, including plastic pellets.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT, and this failure is ongoing.

79.    On information and belief, the Center alleges that as a facility subject to the Special Requirements for Plastic Materials set forth in the 2015 Permit, Rehrig has failed to implement a proper containment system, or alternate suite of eight BMPs, since the 2015 Permit was enacted.

80.    On information and belief, the Center alleges that Rehrig has discharged numerous plastic pellets from the Facility in violation of Section XVIII(A)(2)(b)(viii) of the 2015 Permit, including but not limited to the rain event at the Facility on March 21, 2018.

81.    On information and belief, Plaintiff alleges that since at least August 11, 2013, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for

COMPLAINT

26

the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Sections X(C)(3), X(D)(1), and X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs at the Facility because they do not reflect best industry practice considering BAT/BCT. According to information available to the Center, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

82.    Information available to the Center indicates that as a result of the Facility's practices and without information required in the SWPPP storm water containing excessive pollutants is being discharged during rain events into channels that empty into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay.

83.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

84.    Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is

COMPLAINT

informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

85.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

86.    The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, O&G, zinc, plastic pellets, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

87.    The Center is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.  Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit and the Act.  *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

COMPLAINT

88.     Each day since at least August 11, 2013, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

89.     The Center is informed and believes, and thereon alleges, the Defendant's violations of Effluent Limitations in the General Permit and Act are ongoing and continuous.

90.     Defendant has been in violation of the BAT/BCT requirements every day since at least August 11, 2013.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

91.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

92.     Discharge Prohibition III(C) of the 2015 Permit and Discharge Prohibition A(2) of the 1997 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) of the 2015 Permit and Receiving Water Limitation C(1) of the 1997 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Discharge Prohibition III(D) of the 2015 Permit and Receiving Water Limitation C(2)

of the 1997 Permit and Receiving Water Limitation VI(A) prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

93.     Plaintiff is informed and believes, and thereupon alleges, that since at least August 11, 2013, Defendant has been discharging polluted storm water from the Facility outside of the applicable water quality standard for pH, discharging zinc in excess the applicable value in the California Toxics Rule, and with observations of oil and grease and suspended material in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit and Receiving Water Limitation C(2) of the 1997 Permit.

94.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pH-altering substances, zinc, suspended material, oil and grease, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated into channels that empty into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay.

95.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation

COMPLAINT

C(2) of the General Permit.

96.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

97.    Every day since at least August 11, 2013, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## THIRD CAUSE OF ACTION
### Failure to Comply with
### Special Requirements for Plastic Materials
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

98.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

99.    The General Permit requires dischargers of storm water associated with industrial activity who handle Plastic Materials to implement an on-site containment system and to describe that system in the Facility's SWPPP, in violation of the General Permit.

100.    Each day since July 1, 2015, that Defendant has failed to develop and implement an adequate on-site containment system for the Facility, and to describe that system in the Facility's SWPPP in violation of the General Permit, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

101.    The absence of a requisite on-site containment system and its attendant

description in the SWPPP are ongoing and continuous violations of the Act.

102.   Defendant will continue to be in violation of the requirements of Section XVIII of the 2015 Permit, and the Clean Water Act each and every day it fails to adequately develop, implement, and describe the required on-site containment system for Plastic Materials.

### FOURTH CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

103.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

104.   The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

105.   Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's SWPPP's failure to include efforts to implement and maintain any necessary BMPs that are reflective of BAT/BCT.

106.   Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

107.   Each day since at least August 11, 2013, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. §

COMPLAINT

1311(a).

108.    Defendant has been in violation of the SWPPP requirements every day since at least August 11, 2013.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to adequately develop, implement, and/or revise an adequate SWPPP for the Facility.

**FIFTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

109.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

110.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

111.    Plaintiff is informed and believes, and thereon alleges, Defendant has failed and continues to fail to develop and implement an adequate monitoring and reporting program for the Facility, in violation of the General Permit.

112.    Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to collect and analyze storm water discharges from all required storm events.

113.    Each day since at least August 11, 2013, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General

COMPLAINT

Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

114.    The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

115.    Defendant will continue to be in violation of Section XI of the 2015 Permit and the Clean Water Act each and every day it fails to adequately develop, implement, and/or revise a monitoring and reporting plan for the Facility.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past

COMPLAINT

34

monitoring violations;

g.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to immediately comply with all requirements for Plastic Materials in the General Permit;

i.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

j.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $52,214 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

k.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

l.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

///

///

///

///

///

COMPLAINT

m. Award any such other and further relief as this Court may deem appropriate.

Dated: October 10, 2018                    Respectfully submitted,


                                    By:    __/s/ Douglas J. Chermak_____
                                           Douglas J. Chermak
                                           LOZEAU DRURY LLP
                                           Attorneys for Center for Biological Diversity